UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA SLUSHER,

      Plaintiff,

v.                                                                                   Case No. 06-10746
                                                                          Honorable Patrick J. Duggan

C. CARSON, T. TERRY, and
SHIAWASSEE COUNTY,

      Defendants.
_____/

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on May 23, 2007.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
                      U.S. DISTRICT COURT JUDGE

This action arises from an incident on Plaintiff Linda Slusher's property on May 13, 2004, when Shiawassee County Sheriff Department Deputies Cory Carson and Thomas Terry were dispatched to act as peace officers while a neighbor, Dr. Leroy Waite, retrieved tractors from the property pursuant to a court order. Presently before the Court is Defendants' motion for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) and for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), filed on March 12, 2007. The motion has been fully briefed and the Court held a motion hearing on May 17, 2007. For the reasons set forth below, the Court grants Defendants' motion

1

for summary judgment.[1]

I.   **Standard for Summary Judgment**

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable

---

[1] The Court therefore denies as moot Defendants' motion to dismiss.

inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

## II. Factual and Procedural Background

Ms. Slusher and her husband, Benjamin Slusher, own rural property in Shiawassee County, Michigan. Dr. Waite, who owns adjacent property, was divorced from his wife in 1999. (Defs.' Mot. Ex. 1.) Pursuant to the divorce judgment entered by the Shiawassee County Circuit Court, Dr. Waite was awarded *inter alia* two tractors. (*Id.*) Apparently, however, Dr. Waite's ex-wife had destroyed or concealed certain property awarded to him in the divorce, including the two tractors. (*Id.*) The divorce judgment therefore stated that "if any of the personal property awarded to [Dr. Waite] is removed or missing from the marital home and premises, and if those items are found or discovered by [Dr. Waite], [Dr. Waite] shall be entitled to immediate possession, control, and ownership of such items of personal property." (*Id.*)

On or before May 12, 2004, Dr. Waite discovered that his two tractors were being stored on the Slushers' property. He therefore filed a motion in the Shiawassee County Circuit Court, seeking an order permitting him to enter the Slushers' property and retrieve the tractors, in the presence of local police. (*Id.*) Circuit Court Judge Gerald Lostracco entered such an order on May 12, 2004. (Defs.' Mot. Ex. 2.) In his order, Judge Lostracco provided:

> 1. The Defendant [Dr. Waite] is permitted to take

> immediate possession, or cause the removal, of the tractors on Ben Slusser's [sic] property that are rightfully his and neither the Plaintiff [Dr. Waite's ex-wife], the Slussers [sic], or their agents will interfere with their safe return or cause any damage to them.
>
> 2. Defendant will be permitted to inspect the exterior of the Slussers' [sic] property, excluding the interior of the home, where the tractor's [sic] are currently located with the assistance of the police.

(*Id.*)

On May 13, 2004, Deputies Carson and Terry were dispatched to Dr. Waite's residence. Upon their arrival, Dr. Waite presented the deputies with the court order and requested that they accompany him to the Slushers' property while he retrieved his tractors. After reviewing the contents of the court order, the officers and Dr. Waite proceeded to the Slushers' property. They were met by Mr. Slusher upon their arrival.

Deputy Carson advised Mr. Slusher of the purpose of their visit and showed him Dr. Waite's copy of the court order.[2] At some point during this initial encounter, Dr. Waite expressed a desire to look around the Slushers' property for additional missing property that he was awarded in his divorce. In response, Mr. Slusher indicated that he had no problem handing the tractors over to Dr. Waite, but that he believed the order did not apply to any other property or give Dr. Waite the right to look around the property.

Mr. Slusher then went inside one of two barns located on the property, the "horse

---

[2] The deputies did not have their own copy of the court order and Dr. Waite did not have a second copy.

4

barn," where one of Dr. Waite's tractors was located. Dr. Waite and the deputies followed Mr. Slusher into the horse barn. Mr. Slusher and Deputy Carson then went into a second barn on the Slushers' property, the "pole barn," where Dr. Waite's second tractor was located. After Mr. Slusher, Dr. Waite, and the deputies returned to an area between the two barns, Ms. Slusher approached and Mr. Slusher asked that she be given an opportunity to review the court order.

As Ms. Slusher was reviewing the court order, Mr. Slusher went to locate an air compressor in order to inflate a flat tire on one of the tractors and Deputy Carson entered the pole barn to look for airplane parts belonging to Dr. Waite. In the meantime, as Ms. Slusher was looking over Dr. Waite's paperwork, Dr. Waite was trying to get Deputy Terry to follow him into the horse barn to look for airplane parts. At this point, Ms. Slusher stopped reading and voiced an objection, stating her belief that the order did not permit Dr. Waite to search inside her barns. She and Dr. Waite then began arguing.

A few minutes later, Deputy Carson exited the pole barn and approached Ms. Slusher, Dr. Waite, and Deputy Terry. Deputy Carson appeared agitated and expressed that he had been "on the call" longer than necessary. Deputy Carson then asked Ms. Slusher for the court order, which she was holding in her right hand.

In response, Ms. Slusher indicated that she had not finished reading the order.[3] Deputy Carson stated that she had been given enough time to read it and directed her to

---

[3] According to the parties, although the court order was only two pages, additional papers belonging to Dr. Waite were attached to it.

give it to him. Deputy Carson then reached for the paperwork, but Ms. Slusher pulled her hand away. Ms. Slusher asked if she could make a copy of the order inside her house; Deputy Carson answered that she did not have a right to a copy. (Defs.' Mot., Ex. 8 at 58-60.)

At that point, Deputy Carson made another attempt to grab the paperwork from Ms. Slusher. Ms. Slusher, however, raised her hand into the air, away from his grasp. According to Ms. Slusher, Deputy Carson responded by pulling her arm down with one hand and using his other hand to grab her right hand.[4] (Defs.' Mot., Ex. 8 at 68.) She described that Deputy Carson "pressed his thumb into [her] hand, [her] palm, squeezed the back and twisted [her] fingers back and around." (*Id.*) In response, Ms. Slusher screamed: "that's my bad hand." (*Id.*)

A short while later, the officers and Dr. Waite left the Slushers' property.[5] Ms. Slusher then applied ice to her right hand, took some pain medication, and had Mr.

---

[4]In his incident report, Deputy Carson indicated that he actually took hold of the paperwork in Ms. Slusher's hand the second time he reached for it and, in response, Ms. Slusher grabbed his right hand with her right hand and started to twist his wrist. (Defs.' Mot., Ex. 3.) Deputy Carson reported that he asked Ms. Slusher to let go, but she refused. (*Id.*) He wrote that he then grabbed Ms. Slusher's hand in order to free himself from her grip. (*Id.*; Ex. 4 at 63-65, 68.) Ms. Slusher's description of the incident to her doctor six days after the incident– which her doctor contemporaneously recorded– conforms to Deputy Carson's account. (*Id.*, Ex. 10.) Nevertheless, because Ms. Slusher's description of the incident during her deposition is more favorable to her, the Court must accept that version for purposes of deciding Defendants' summary judgment motion.

[5]By this time, Mr. Slusher had driven Dr. Waite's tractors from the Slushers' property onto Dr. Waite's property.

Slusher bandage the hand. Ms. Slusher subsequently called 911 and told the dispatcher that she had been assaulted by a deputy and wanted to file a report. Deputies Carson and Terry returned to the Slushers' property in response to the 911 dispatch.

When the deputies arrived, the Slushers stepped outside their house. According to the Slushers, the deputies began laughing when they saw Ms. Slusher's bandaged hand. Deputy Terry then told Ms. Slusher that they could arrest her for assaulting them. A few minutes later, the deputies left and Ms. Slusher went to the emergency room. Ms. Slusher claims that, due to a preexisting condition called Multiple Enchodromatosis (Ollier's Disease), Deputy Carson's actions when he grabbed her right hand caused her to lose the use of the hand for several months, impaired her range of motion in the hand, and has caused her to drastically lose grip strength and fine motor skills.

The day following the above incident, Ms. Slusher attempted to file a complaint regarding Deputy Carson's actions with the Shiawassee County Sheriff's Department. Ms. Slusher testified at her deposition that the County Undersheriff, Keith Kewish, called her about a week after the incident and that she met with him on May 20, 2004. (Defs.' Mot., Ex. 8 at 115-16.) According to Ms. Slusher, at the meeting, the Undersheriff laughed at her, refused to take pictures of her injuries, threatened her with arrest, and would not let her make a report. (*Id*. at 116-17.) Nevertheless, there is evidence that Undersheriff Kewish did document Ms. Slusher's complaint. (Defs.' Mot., Ex. 14.)

Lieutenant David Kirk, who was in charge of Internal Affairs for the Shiawassee County Sheriff's Department, subsequently contacted Ms. Slusher by phone on May 24,

2004, and asked her to meet with him and give a statement regarding the May 13 incident. (*Id*. at 123.) According to Ms. Slusher, she told Lieutenant Kirk that because she believed criminal assault charges were being filed against her, she only would meet with him in the presence of her attorney. Ms. Slusher claims that Lieutenant Kirk refused her request and she therefore never met with him. (*Id*. at 124.) Lieutenant Kirk subsequently prepared an investigatory report in which he concluded that the deputies "acted well within the use of force continuum guidelines for [the Sheriff's] Department." (Defs.' Mot., Ex. 15.)

On February 17, 2006, Ms. Slusher filed the pending action against Deputies Carson and Terry and Shiawassee County. In her complaint, Ms. Slusher alleges the following counts, apparently against all Defendants: (I) a Fourth Amendment violation due to excessive force pursuant to 42 U.S.C. § 1983; (II) assault and battery in violation of Michigan law; and (III) gross negligence in violation of Michigan law.[6] Ms. Slusher further alleges a Fourth Amendment violation pursuant to Section 1983 against Shiawassee County, only (Count IV). Ms. Slusher identifies the following customs and/or policies of the County in her complaint to support this last claim:

>   a. Failing to supervise its officers to prevent the violations of citizens' constitutional rights;

---

[6]On March 14, 2007, Ms. Slusher filed a "Motion to Amend/Clarify Complaint," in which she seeks to add a claim against Deputies Carson and Terry for conducting an illegal search of her property on May 13, 2004. The Court will address her motion in a separate opinion and order.

> b. Failing to adequately train or supervise officers regarding the proper use of force;
>
> c. Having an unwritten policy or custom of discouraging citizen's complaints, or threatening to arrest citizen's [sic] who state their intention to file a complaint;
>
> d. Failing to investigate complaints and discipline officers who are found violating citizens' rights.

(Compl. ¶ 51.)

## III. Applicable Law and Analysis

### A. Shiawassee County

A municipality is not liable under Section 1983 for the conduct of its employees or agents under the theory of *respondeat superior*. *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005)(citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036 (1978)). "A municipality may be held liable only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" *Id.* at 818-19 (quoting *Monell*, 436 U.S. at 694, 98 S. Ct. at 2037-38). For municipal liability to attach, the policy or custom that caused the plaintiff's injury must have been promulgated by the municipality's legislative body or an official vested with "final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S. Ct. 1292, 1299 (1986).

At the motion hearing, Ms. Slusher's counsel informed the Court that, despite the allegations in her complaint, Ms. Slusher's claim against Shiawassee County is premised

solely on its Sheriff Department's policy and/or custom of failing to investigate misconduct by its officers and harassment of citizens who attempt to file citizen complaints. However, any failure by the Sheriff Department to investigate the officers' alleged misconduct, did not "inflict[] the injury" of which Ms. Slusher complains– i.e. the violation of her right to be free from excessive force under the Fourth or Fourteenth Amendments. *See supra*. In any event, Ms. Slusher presents no evidence to demonstrate that Shiawassee County or its Sheriff's Department maintain a policy, custom, or practice of failing to investigate complaints or discipline officers. In other words, she presents no evidence of other citizen complaints being ignored by the County or of other officers not receiving discipline for misconduct.

As to the other policies and customs described in her complaint, Ms. Slusher presents no evidence to establish that Shiawassee County maintains such policies or customs. In fact to the contrary, in her response to Defendants' motion, Ms. Slusher refers to evidence indicating that the County actually maintains policies *prohibiting* the use of excessive force and *requiring* officials to explain its complaint procedure to citizens and to investigate such complaints. (Pl.'s Resp. at 6-10 & 19-20.) Included in this evidence are specific policy directives of the County Sheriff's Department– which Ms. Slusher attached as exhibits to her response– that *inter alia* require members of the Department to "courteously and promptly respond to any complaints made by a citizen against any Member or the Department," "to competently and professionally investigate all such allegations in a timely manner," and to "use . . . only the minimum force

necessary to accomplish a legitimate purpose." (*Id*. at 10 & Exs. O & P.)

The evidence to which Ms. Slusher refers in support of her claim against Shiawassee County (*see* Pl.'s Resp. at 19-20) shows, at most, that the County maintains policies prohibiting the constitutional violations she asserts but that certain Sheriff Department employees ignored those policies. As indicated previously, a municipality is not liable based solely on its employees' misconduct. *See, supra*. To the extent Ms. Slusher alleges that Undersheriff Kewish's response to her complaint reflects a County policy of discouraging citizen complaints or of not taking such complaints seriously, Ms. Slusher's own evidence indicates that Undersheriff Kewish was not an official vested with final policymaking authority. (*Id*., Ex. G at 15.) Thus the Court concludes that Shiawassee County is entitled to summary judgment.

### B. Deputies Terry and Carson

As an initial matter, Ms. Slusher fails to identify any conduct by Deputy Terry, specifically, that violated her constitutional rights or constituted assault and battery or gross negligence. When asked during her deposition what Deputy Terry was doing when Deputy Carson grabbed her, Ms. Slusher stated that he "didn't do or say anything."[7]

---

[7]Although Ms. Slusher testified that Deputy Terry did not do anything, at the motion hearing, Ms. Slusher's counsel noted that Deputy Terry testified during his deposition that he grabbed Ms. Slusher's forearm at some point during her physical encounter with Deputy Carson. (Pl.'s Resp., Ex. D at 39-40.) Assuming Deputy Terry grabbed Ms. Slusher's forearm, the Court concludes, for the same reasons discussed *infra* with respect to Deputy Carson's actions, that his conduct did not violate Ms. Slusher's

11

(Defs.' Mot., Ex. 8 at 70.) To succeed on her claims against Deputy Terry, Ms. Slusher must do more than show that he played a passive role in the violation of her rights; she must demonstrate that *he* engaged in specific conduct violating her rights. *See Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)(holding that the plaintiff alleging a Section 1983 violation must show that the officer "did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on"); *Eckford v. El-Toombs*, 760 F. Supp. 1267, 1272 (W.D. Mich. 1991)(holding that "[t]o establish liability under section 1983 against an individual defendant, [the] plaintiff must plead and prove that the defendant was personally involved in the activity that forms the basis of the complaint.") The Court therefore concludes that Deputy Terry is entitled to summary judgment with respect to Ms. Slusher's claims.

Turning to Deputy Carson, Ms. Slusher alleges that his action in grasping her hand when he attempted to retrieve Dr. Waite's paperwork violated her Fourth Amendment rights and constituted assault and battery and gross negligence. Defendants argue that Deputy Carson's actions were reasonable in response to Ms. Slusher's refusal to obey his commands to return the documents and, as such, do not amount to a Fourth Amendment violation, assault and battery, or gross negligence. Defendants further contend that Deputy Carson is entitled to qualified immunity with respect to Ms. Slusher's Section 1983 claim.

---

constitutional rights.

### 1. 42 U.S.C. § 1983

To succeed on a Section 1983 claim, a plaintiff must demonstrate that the defendant was acting under color of state law and that the defendant's conduct deprived the claimant of rights, privileges or immunities secured by the Constitution or laws of the United States. *Bennett*, 410 F.3d at 817 (citing *McKnight v. Rees*, 88 F.3d 417, 419 (6th Cir. 1996)). There appears to be no dispute in this case with regard to the first requirement. Thus the Court will turn its attention to the second requirement.

Ms. Slusher alleges a violation of her Fourth Amendment rights. However, "'[t]he Fourth Amendment protects against unreasonable *seizures*, not unreasonable or even outrageous conduct in general.'" *Cameron v. City of Pontiac*, 813 F.2d 782, 784 (6th Cir. 1987)(quoting *Galas v. McKee*, 801 F.2d 200, 202 (6th Cir. 1986)(emphasis added in *Cameron*)(internal quotation marks omitted)). A person is "seized," for purposes of the Fourth Amendment, "'whenever a police officer accosts an individual and restrains his freedom to walk away, . . .'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 16, 88 S. Ct. 1868, 1877 (1968)). In other words, "'[a] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained.'" *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S. Ct. 1870, 1877 (1980)).

The undisputed facts in the present case indicate that Ms. Slusher never was seized within the meaning of the Fourth Amendment. There is no indication that Ms. Slusher was not free to walk away from and ignore the deputies. While Deputy Carson told Ms. Slusher that she could not make a copy of Dr. Waite's paperwork inside her house, there

is no evidence suggesting that either deputy told Ms. Slusher that *she* could not leave or that they prevented her from leaving.

"When a 'nonseized' individual is physically injured by law enforcement officers," the Sixth Circuit has directed courts to "analyze the individual's excessive-force claim pursuant to the substantive component of the Fourteenth Amendment." *Slocum v. Palinkas*, 50 Fed. App'x 300, 302 (6th Cir. 2002)(unpublished op.)(citing *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000)). "The substantive component of the due process clause insulates citizens against the arbitrary exercise of governmental power. Accordingly, conduct of a law enforcement officer towards a citizen which 'shocks the conscience' denies the victim fundamental substantive due process." *Claybrook*, 199 F.3d at 359 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46, 118 S. Ct. 1708, 1716-17 (1998)). The standard applied to determine whether an officer's conduct "shocks the conscience" depends upon how quickly the officer must react to the circumstances presented:

> In situations wherein the implicated state, county, or municipal agent(s) are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action (such as, for example, most occasions whereby corrections officials ignore an inmate's serious medical needs), their actions will be deemed conscience-shocking if they were taken with "deliberate indifference" towards the plaintiff's federally protected rights. . . . In contradistinction, in a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation (such as, for example, a prison riot) public servants' reflexive actions "shock the conscience" only if they involved force employed "maliciously and sadistically for the

14

> very purpose of causing harm," rather than "in a good faith
> effort to maintain or restore discipline."

*Id.* (internal citations omitted).

This Court believes that the May 13, 2004 incident on the Slushers' property more closely resembles those situations where officers must act in rapidly evolving, fluid, and [potentially] dangerous predicaments.[8] Applying the standard appropriate in such circumstances, the Court concludes as a matter of law that, even accepting Ms. Slusher's version of the events as true, the force Deputy Carson applied to Ms. Slusher's hand in his attempt to retrieve Dr. Waite's paperwork was not "applied maliciously and sadistically for the very purpose of causing harm."

But even applying the less deferential "deliberate indifference" standard, the Court does not find Deputy Carlson's actions "conscience shocking." As the Supreme Court "has repeatedly emphasized . . . only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" . . .. *Lewis*, 523 U.S. at 846, 118 S. Ct. at 1716

---

[8]In light of the circumstances that required Dr. Waite to retrieve his possessions from the Slushers' property and the interaction between Dr. Waite and Ms. Slusher during the repossession, there certainly was a threat that physical violence could quickly develop. Specifically, Dr. Waite was involved in an apparently contentious divorce which involved his ex-wife's destruction and/or concealment of certain property awarded to him in the divorce judgment. (*See* Defs.' Mot., Ex. 1.) Some of this property was hidden on the Slushers' property– most likely with their consent and perhaps therefore suggesting that they had taken the side of Dr. Waite's ex-wife in the divorce– and Dr. Waite believed he needed a court order and police assistance to effectuate a return of the property. During Dr. Waite's repossession of his tractors, he and Ms. Slusher started arguing. In fact, from inside the Slusher's pole barn, Deputy Carlson was able to hear their argument.

(quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129, 112 S. Ct. 1061, 1071 (1992)). Again, as a matter of law, Deputy Carson's actions do not fall within this category of conduct and thus the Court holds that his conduct did not deprive Ms. Slusher of her Fourteenth Amendment rights. Deputy Carson therefore is entitled to summary judgment with respect to Ms. Slusher's Section 1983 claim against him.

### 2. Assault and Battery/Gross Negligence

Defendants argue that the deputies are immune from Ms. Slusher's assault and battery claim pursuant to Michigan's Governmental Tort Liability Act ("GTLA" or the "Act"). MICH. COMP. LAWS ANN. § 691.1407. Defendants further argue that the deputies conduct did not amount to gross negligence.

Pursuant to the GTLA, an individual officer or agent of a governmental agency is immune from tort liability for injuries to persons if all of the following conditions are met:

> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

MICH. COMP. LAWS ANN. § 691.1407(2). The Act defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury

16

results." *Id*. § 691.1407(2)(c). The Act further provides that "[s]ubsection (2) shall not be construed as altering the law of intentional torts as it existed prior to the effective date of subsection (2)." *Id*. § 691.1407(3).

Prior to the effective date of subsection (2), governmental immunity generally was not available as a defense to an intentional tort claim. *Sudal v. Hamtramack*, 221 Mich. App. 455, 458, 562 N.W.2d 478 (1997). However, "[g]overnmental actions which would normally constitute intentional torts [were] protected by governmental immunity if those actions [were] justified." *Brewer v. Perrin*, 132 Mich. App. 520, 528, 349 N.W.2d 198, 202 (Mich. Ct. App. 1984); *Burns v. Malak*, 897 F. Supp. 985 (E.D. Mich. 1995). As the Michigan Court of Appeals explained in *Brewer*, justifiable actions are those "which an ordinarily prudent and intelligent person with the knowledge and in the situation of the [] officer, would have deemed necessary." 132 Mich. App. 528, 349 N.W.2d at 202 (internal citations and quotation marks omitted); *see also Vanvorous v. Burmeister*, 262 Mich. App. 467, 483, 687 N.W.2d. 132, 142 (2004). Thus, for example, under Michigan law a police officer is immune from tort liability for injuries caused during an arrest if the officer used reasonable force when making the arrest. *Id*.

The Court concludes, as a matter of law, that Deputy Carson's actions on May 13, 2004, were objectively reasonable under the circumstances. According to Ms. Slusher's own description at her deposition of her encounter with Deputy Carson, before Deputy Carson actually touched her, he instructed her to return Dr. Waite's paperwork more than once and he attempted to grab it. Ms. Slusher admittedly failed to comply with Deputy

17

Carson's demands and, when Deputy Carson reached for the paperwork, she pulled it from his reach.  It was objectively reasonable, when Deputy Carson attempted to retrieve the paperwork a second time, for him to grab Ms. Slusher's hand in order to secure its release.  Importantly, Deputy Carson had no reason to know that Ms. Slusher had a "bad hand" and that, therefore, his actions would cause her harm.  Therefore, the Court holds that Defendants are entitled to summary judgment with respect to Ms. Slusher's assault and battery and gross negligence claims.

     Accordingly,

**IT IS ORDERED**, that Defendants' motion for summary judgment is **GRANTED**.

                                              s/PATRICK J. DUGGAN
                                              UNITED STATES DISTRICT JUDGE

Copies to:
Christopher J. Trainor, Esq.
Patrick A. Aseltyne, Esq.
Jason D. Kolkema, Esq.